2024 PA Super 285

| | | |
|---|---|---|
| IN THE INTEREST OF: R.H.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 936 MDA 2024 |

Appeal from the Decree Entered June 4, 2024
In the Court of Common Pleas of York County
Orphans' Court at 2024-0065a

| | | |
|---|---|---|
| IN THE INTEREST OF: R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 937 MDA 2024 |

Appeal from the Order Entered June 6, 2024
In the Court of Common Pleas of York County
Juvenile Division at CP-67-DP-0000057-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 938 MDA 2024 |

Appeal from the Decree Entered June 4, 2024
In the Court of Common Pleas of York County
Orphans' Court at 2024-0064a

| | | |
|---|---|---|
| IN THE INTEREST OF: J.K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S36031-24

:
:
:
APPEAL OF: E.B., FATHER                   :
:
:
:
:
:                  No. 939 MDA 2024

Appeal from the Order Entered June 4, 2024
In the Court of Common Pleas of York County
Juvenile Division at CP-67-DP-0000058-2023

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

OPINION BY BENDER, P.J.E.:                     **FILED: DECEMBER 3, 2024**

E.B. (Father) appeals from the decrees terminating his parental rights to R.H.B. and J.K.B. (Children), and the orders changing Children's permanency goals from concurrent return to parent and adoption, to adoption and permanent legal custodian.[1]  After careful consideration, we vacate the decrees and orders, and remand for further proceedings.

*CASE HISTORY*

R.H.B. was born in December 2019, and J.K.B. was born in October 2021.  This case began in February 2023, when the York County Office of Children, Youth and Families (CYF) filed for emergency protective custody of Children.  Children were 3 and 1½ years old at the time, and Father was

---

[1] Children's mother, R.G. (Mother), voluntarily relinquished her parental rights.  **See** N.T., 6/4/24, at 5-6.  Following a hearing, the trial court entered decrees confirming her consent and terminating her parental rights.

- 2 -

incarcerated in a neighboring county.[2]  CYF sought protective custody based on Mother abusing drugs and leaving Children in the care of others for "long lengths of time."  Shelter Care Application, 2/9/23, at 3-4.

The trial court explained:

At the Shelter Care Hearing held on February 10, 2023, Mother admitted to using heroin and methadone but said that she did not leave Children with a babysitter without providing food and clothing for Children.  Father was unable to be at the hearing as he was in[carcerated,] and arrangements for a Zoom appearance could not be made.  It is self-evident that Dauphin County Prison is not located within York County, so at this point, and at all future points in the case, Father did not reside within York County.  Legal and physical custody were given to CYF by order [entered on] February 13, 2023.

An adjudicatory hearing was held [on] February 17, 2023.  Children were removed from paternal grandmother's care and placed into a foster home together at her request on February 13, 2023.  … Father could not be contacted at Dauphin County Prison.

On April 6, 2023, CYF made a motion to modify the placement of Children and the motion was granted.  Children were placed in the home of [their current foster parents]on April 10, 2023.

A Status Review Hearing was held on May 23, 2024.   … Father continued to be incarcerated.   Children continued in their placement.

On July 11, 2023, [a permanency review hearing was held and] the court issued a Permanency Review Order finding … Father had no compliance with the permanency plan.  … Father continued to be incarcerated at Dauphin County Prison.  Children continued to be in the care of the [] foster family.

_____

[2] Father was awaiting trial in Dauphin County on charges of driving under the influence of alcohol (DUI), endangering the welfare of children (EWOC), and recklessly endangering another person (REAP).  **See** 75 Pa.C.S. § 3802(a)(1) and 18 Pa.C.S. §§ 4304(a)(1), 2705.

A Status Review Hearing was held [on] August 21, 2023. … Father continued to be incarcerated. At this hearing[,] the court took note that Father had been found guilty following a trial in the case docketed at CP-22-CR-0000356-2022 for two counts of [EWOC], DUI — 2nd Offense, and [REAP] on March 14, 2023. Father was sentenced to 1.5 - 3 years in prison[, with 1 year and 10 months of credit for time served]. It was also determined that Father had been moved to SCI Smithfield.

The children endangered in [Father's] trial were [C]hildren in this matter, as [Father] was operating a motor vehicle … while he was under the influence…. CYF caseworker Isabella Grab testified that Father, while in Dauphin County Prison, had not requested any services and he remained incarcerated. She did describe practical difficulties in making Father available for court proceedings in person or virtually from Dauphin County Prison, including limitations on communications imposed by Dauphin County Prison. Father reported to Ms. Grab that he was not doing any services within the prison. The court noted that at least as of August 21, 2023, Father's communication problems as they may have related to Dauphin County Prison would be resolved by his move to the SCI system. Children continued to be in their foster home placement.

At the Status Review Hearing held [on] October 16, 2023, … Father continued to be incarcerated and requested court appointed counsel. CYF responded to the request by mailing Father the application for court appointed counsel. Children continued in their foster care placement.

[On] December 11, 2023, a combined Permanency and Dispositional Hearing was held. … Father continued to be incarcerated and had no visits with Children as the prison staff could not be contacted. Father was evidently moved to SCI Rockview on or about October 19, 2023[,] according to his publicly available criminal court docket sheet. It is believed … Father remains at SCI Rockview pursuant to the SCI Inmate Locator. SCI Rockview is not located within York County. Children continued to remain in their foster home placement.

A Status Review Hearing was held [on] March 12, 2024. … There had been no changes to Father's status at this time. Children had begun to interview with pre-adoptive foster homes.

Trial Court Opinion (TCO), 7/24/24, at 2-6 (citations and footnotes omitted).

On April 19, 2024, CYF filed a petition to terminate Father's parental rights. CYF alleged grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(1),(2),(5), and (8), and averred that termination served Children's needs and welfare pursuant to 23 Pa.C.S. § 2511(b). Along with the termination petition, CYF filed a motion for judicial notice of the dependency proceedings, and a motion to change Children's permanency goals.

The trial court held a hearing on June 4, 2024. CYF presented testimony from the "contracted caseworker" for CYF, Michelle Royer; R.H.B.'s therapist, Ellie Williams; and Children's foster parent, [L.W.]. N.T., 6/4/24, at 13, 48, 57. Mother and Father also testified. At the conclusion of the hearing, the court entered decrees terminating Father's parental rights, and orders taking judicial notice of the dependency proceedings and changing Children's permanency goals.

The trial court entered separate termination decrees and goal change orders for each child. The decrees do not mention statutory grounds for termination. The decrees state:

AND NOW, this 4th day of June, 2024, upon consideration of the within Petition and after hearing had thereon:

The [c]ourt, being satisfied as to the truth of the facts set forth in the Petition, finds that [Father] has forfeited his parental rights with respect to [R.H.B./J.K.B.], and further finds that it is in the best interest of [R.H.B./J.K.B.] that the Petition be granted, and it is hereby ORDERED, ADJUDGED AND DECREED that all parental rights of [Father] in respect to [R.H.B./J.K.B.] are terminated forever, and custody of [child] is hereby awarded to [CYF], …

- 5 -

which is authorized to consent to the adoption of [child], and the child may now be adopted without further consent or notice to the parents. …

Final Decrees for Involuntary Termination of Parental Rights, 6/4/24.

The goal change orders state that the concurrent placement plan for Children is adoption and "non-relative" permanent legal custodian. Orders, 6/4/24.

On July 1, 2024, Father filed timely appeals from the decrees and goal change orders, along with concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).[3]

Father presents the following question for our review:

Did the trial court commit an abuse of discretion and error of law in finding that factors other than Father's incarceration prevented reunification, when granting the Petition for Termination of Parental Rights, and changing the Children's permanency goals[?]

Father's Brief at 5.

*LAW*

A trial court may terminate the "rights of a parent in regard to a child … after a petition filed on any of [eleven] grounds." 23 Pa.C.S. § 2511(a). Typically, and in very general terms, a petitioner must prove that the parent is unable or incapable of properly caring for the child, and has failed to remedy the inability or incapacity. **See id.** (setting forth specific grounds for termination). "In evaluating whether the petitioner proved grounds under § 2511(a), the court must focus on the parent's conduct." **Int. of M.E.**, 283

_____

[3] This Court consolidated the appeals on July 30, 2024.

A.3d 820, 830 (Pa. Super. 2022) (citation omitted). The petitioner must establish statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* If the court finds a petitioner has proven grounds for termination, it must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).

A trial court decides a dependent child's placement goal pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301-65. Section 6351 directs that a court "not only consider the appropriateness and feasibility of a child's current goal during the permanency review hearings, it also mandates that the court enter an order addressing whether to continue, modify or terminate placement." *Int. of K.C.*, 319 A.3d 596, 600 (Pa. Super. 2024) (citation omitted).

This Court reviews appeals from termination decrees and goal change orders for an abuse of discretion. The Pennsylvania Supreme Court has stated:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012) (citations omitted). An appellate court is not required to accept the lower court's inferences or conclusions of law. *See In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (Pa. 2015).

Notably, the "overarching purpose of the Juvenile Act" is to "preserve the unity of the family whenever possible." *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citing 42 Pa.C.S. § 6301(b)(1)). This Court has recognized that "'critical rights' are still at issue in dependency proceedings, including the appropriateness of the Commonwealth's coercive intervention into a family's life, the physical and legal custody of the subject child, and the parents' respective fitness to obtain or retain such custody." *Int. of J.F.*, 308 A.3d 1252, 1260 (Pa. Super. 2024). Thus, when reviewing goal change orders, "we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate principles to that record." *In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted).

In termination cases, our Supreme Court has "readily comprehend[ed] the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (citations omitted). "Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights

be based solely on competent evidence." *Id.* (citations and quotation marks omitted). Appellate courts "must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *Id.* at 359 (citation omitted).

*ARGUMENTS*

Father argues his incarceration "was the sole barrier to participating in services to work towards reunification with the Children." Father's Brief at 7. He states that because of his incarceration, he was unable "to meaningfully participate in judicial proceedings, and for the vast majority of the case, proceedings and hearings were held in his absence." *Id.*

Father explains that "[p]rior to his incarceration, [he] saw the Children daily, as he lived with Mother." *Id.* at 9. He reiterates that he was precluded from appearing at hearings, which "continue[d] in his absence, without an opportunity [for Father] to question witnesses, assert a position, or request services and be included in the permanency plan." *Id.* at 10.

Father cites testimony from the August 21, 2023 review hearing, where CYF's attorney asked CYF caseworker Isabella Grab the following:

> Q. Let's begin with efforts that you made to ascertain or obtain [F]ather's presence for this proceeding.
>
> A. Yeah. Since [F]ather's incarcerated in Dauphin [C]ounty[,] there have been some transportation issues. They apparently don't do [Z]oom … and the only way he's allowed to call in is if he uses his 15-minute phone call in increments, which we realize wouldn't work for our courts. Transportation, though. We've looked into getting him transported for court and, again, hasn't been very smooth.

I asked [Father], when I was able to briefly talk to him on the phone, if he has a counselor or anyone he talks to in the prison and he said that [he] doesn't talk to anybody. He just does his time to get out, so he didn't have a connection for me to meet with.

*Id.* at 11 (citing N.T., 8/21/23, at 27-28). Father claims Ms. Grab's "attempts were certainly in vain, as Father was no longer at Dauphin County Prison, but had been transported to SCI Smithfield. It seems suspect that there would be a finding of reasonable efforts, when [CYF] had not bothered to ascertain Father's actual whereabouts." *Id.*

Father adds:

[T]he trial court allowed the proceedings to continue without Father's presence for what equated to more than half of the dependency, as the petition to terminate parental rights was filed on April 19, 2024. Of course, the trial court could not consider any remedial measures taken by [Father] after that date.

Father was also not present for the status review hearing on October 16, 2023. [CYF's counsel] stated, "I believe [Father] remains in SCI Camp Hill. We do not have the ability to make his presence available here from that facility." [N.T., 10/16/23, at 4-5.] Never, in any of the hearings to this point, did any party offer proof of efforts to secure Father's participation. Notably, Father had requested legal counsel prior to the October 16, 2023 hearing. … Despite Father having requested legal representation, the proceedings once again continued without him having an opportunity to cross examine witnesses, or present evidence or argument in his favor.

Finally, on December 11, 2023, a mere one-hundred-twenty-four days prior to the filing of the petition to terminate his parental rights, Father was made available to participate remotely, though still without the legal counsel he had requested.

At the next review [hearing on] March 12, 2024, Father was again not present. [CYF's counsel] stated, "[F]ather, … is not present, I guess the SCI did not make him available for today's hearing,

but his counsel, Attorney Jason Shirey, is here ….” [N.T., 3/12/24, at 3.] The hearing, [which was] the final hearing prior to the termination [hearing], went on. During the hearing, the [CYF] caseworker stated that she had contact with Father, via three-way calls arranged by Paternal Grandmother. The caseworker would go on to testify that a permanency meeting was arranged, and that Father logged into the meeting and waited in the waiting room. However, the meeting was rescheduled, without notice to Father, who again was not able to participate, a[nd] the meeting went on without him.

*Id.* at 12-14.

According to Father, "virtually no efforts were made to reunify Father with the Children" despite "his demonstrably short incarceration[.]" *Id.* at 8-9. He stresses that he lived with Mother and the Children prior to his incarceration, and cites the testimony of CYF caseworker Tess Shortt at the dependency hearing, where Ms. Shortt responded to CYF's counsel asking:

Q. To your knowledge, was there any type of custody agreement involved prior to [CYF's] involvement?

A. No. I believe mom and dad are still in a relationship.

*Id.* at 10 (citing N.T., 2/17/23, at 18).

Father asserts:

What fell by the wayside is the fact that Father resided with the Children, had a bond with them and was a daily source of parental care and affection. As he was not present for the hearing, he had no opportunity to present evidence or argument to this effect.

*Id.* Further, he explains:

Father was incarcerated in several different institutions. Thus, he was not in any one place long enough to complete any therapeutic programs or services, despite his making inquiries to do so, as he testified to on June 4, 2024. During the dependency action, Father was incarcerated in the Dauphin County Prison, moved

- 11 -

briefly to SCI Camp Hill, then to SCI Smithfield, then back to Camp Hill, then once more to SCI Rockview.

*Id.* at 16 (citation omitted).

In response, CYF argues the trial court's decrees and orders are "supported by competent evidence." CYF's Brief at 18, 22.[4] CYF asserts it made "[r]easonable efforts … to finalize the [p]ermanency [p]lan," but Father "made no progress toward alleviating the circumstances which necessitated the original placement." *Id.* at 11-12, 16, 18. CFY concedes "incarceration alone cannot constitute grounds for termination," but states that Father had a duty to "foster a continuing relationship" with Children. *Id.* at 26 (citing ***In re A.P.***, 692 A.2d 240 (Pa. Super. 1997)). According to CYF, "[t]he conditions which led to the placement continue to exist; namely, Father remains incarcerated." *Id.* at 18.

After careful review, we find merit to Father's argument.

*DISCUSSION*

*Termination of Father's Parental Rights*

Although the trial court referenced CYF's alleged grounds for termination at the conclusion of the termination hearing, the court does not identify statutory grounds in the termination decrees. The court, "being satisfied as to the truth of the facts set forth in the Petition, f[ound Father] forfeited his

---

[4] Children's guardian *ad litem* advised she would not be filing a brief, although she "concurs with the conclusions" of the trial court. *See* "No Brief to be Filed by Appellee" Letter, 9/19/24. Children's legal counsel has not filed a brief or otherwise communicated with this Court.

parental rights … and further f[ound] it is in the best interest of [R.H.B./J.K.B.] that the Petition be granted." Decrees, 6/4/24.

Similarly, in its opinion, the trial court does not articulate findings regarding grounds for termination, although it quotes the statute in its discussion. *See* TCO at 9-11 (quoting 23 Pa.C.S. § 2511(a) and (b) verbatim); *id.* at 11 (trial court stating it "is expected to consider factors outside of Father's incarceration," and "considered the totality of the case and the circumstances that led up the termination hearing").

CYF alleged grounds for terminating Father's parental rights pursuant to Section 2511(a)(1), (2), (5), and (8). "This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b)," to affirm the termination. *Int. of M.E.*, 283 A.3d at 830 (citation omitted).

*Subsections 2511(a)(5) and (8)*

First, we find Father's parental rights could not be terminated under subsections 2511(a)(5) and (8). Both subsections provide for termination when the child "has been removed from the care of the parent." *Id.* It is undisputed that Children were not removed from Father's care. Father was incarcerated when CYF removed Children from Mother's care. Thus, the trial court could not terminate Father's parental rights under subsections (a)(5) and (8), because those subsections "are both predicated on removal of the child from the care of the parent" and "similarly inapplicable." *In re C.S.*, 761 A.2d 1197, 1201 n.5 (Pa. Super. 2000) (*en banc*); *id.* at 1200 (finding

termination of a father's parental rights under subsections 2511(a)(5) and (8) was "not appropriate" because the father was incarcerated when the agency removed the child from the care of his mother).

*Subsections 2511(a)(1) and (2)*

At the conclusion of the June 4, 2024 hearing, the trial court expressed similar reasoning for terminating Father's rights under subsections 2511(a)(1) and (2). These subsections involve a parent's refusal or failure to perform parental duties, and a parent's continued incapacity or failure to parent. Under subsection 2511(a)(1), grounds for termination exist when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

The trial court recognized, "Father in this case is incarcerated and it's difficult to perform parental duties while … incarcerated." N.T., 6/4/24, at 91. The court continued:

> On the other hand, the last time that he had anything to do with [C]hildren really in person, he was in a car, operating it and intoxicated and jeopardizing their lives. Which he denies today, and he says that he didn't really do anything wrong actually. And I can't disturb the conclusion of, you know, the trial that occurred up in Dauphin County. I mean, that was -- there was, I guess, a verdict. So, you know, there's a determination of guilt that, yes, he did, in fact, do it.
>
> The standard in that kind of situation, you know, criminal court is beyond a reasonable doubt, which is greater than the clear and convincing standard that I have today.

So the last time that the Father had these the children, he was drunk and jeopardizing their lives by driving around with them in a motor vehicle. So that's kind of the starting point, I guess.

And since then, what has he done to show that he's not relinquishing his claim? Well, he had contact with the caseworker last fall -- in August because he acknowledged communicating with Ms. Grab.

You know, he really hasn't done anything in terms of getting treatment. I think that is really a critical issue -- or one of the major issues that I have that[,] I guess, what's been offered today is that he'll pop out of Rockview and come down to York County and take these kids under his wing and he'll be off and running as dad again.

Not so fast. He's got the [EWOC] and DUI conviction[s]. He's got essentially serious … offenses that involve [C]hildren as victims. Not just some other kids, or, you know, some unknown child in the community that maybe he sped past in a playground or something.

These are his own kids, in his own vehicle while he was drunk and got convicted. You know, he thought nothing of doing what he really needed to do with them [*sic*].

I just don't find him credible at all. Is he suffering from substance abuse, or -- I guess somebody asked, is he in active addiction. No, not at all. It was fine up until the time leading up to the kids.

Well, if you are putting the kids in the car and driving around with them drunk, you are not fine and that is a significant indicator to me that your substance use is out of control, if you are in a position where that is a good idea and something that you think is okay.

And whether or not, you know, Father denies that at this point, the problem is the jury convicted him. So it is what it is.

So has he done anything to put himself in a position where he's not relinquishing his parental claim? Is he providing any support? No. He's not able to provide any support, I guess, because he can't work and be in jail. No savings were available for [C]hildren. I guess his family members were unable to provide the support or any kind of temporary shelter from the storm.

I'm not sure what, in fact, he's done. He hasn't gotten a risk of harm evaluation done. There's really nothing that's been done to move the ball forward for him.

He would be starting from the very starting line in this case, and it would be the day that he walks out of prison. If, in fact, it is in August, which I have my doubts on how I read the sentence, but maybe I'm wrong on that. I don't know.

*Id.* at 91-94.

The trial court then addressed subsection 2511(a)(2), which provides

for termination when:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

The trial court continued:

The second allegation is that … repeated, continuing incapacity of … the parent that has caused the child to be without essential parental care, control or subsistence necessary for the child's physical or mental wellbeing[,] and conditions that cause the incapacity, abuse or neglect, cannot or will not be remedied by the parent.

One of the contributing factors here is that Father's, I believe unaddressed substance abuse disorder, related to -- at least to alcohol. I'll probably never know because there was no chemical testing [for] whether there w[ere] any drugs involved. And I'm not going to take any surmise of that, but I'll take under serious consideration that he was, in fact, convicted of DUI while driving around with the kids in the car, which suggests to me more [than] a casual relationship with alcohol.

Anybody who chooses to do that -- and it was a choice -- is involuntarily [*sic*] risking the lives of his children and other motorists on the road, in addition to himself, [and] suggests that

- 16 -

his use of controlled substance or alcohol I should say, is out of control.

What has he done to remedy it in the period since that occurred? Well, apparently nothing. So that is what I would definitely consider to be a refusal to do what is necessary to address the causes of incapacity, abuse, neglect.

I think abuse would definitely be something that I would characterize as consistent with driving around [in] the car while you are drunk with kids in the car. He's done nothing to get treatment for it and even today he will not acknowledge the fact that he was [DUI]. That's … what the first step is, that acknowledgment. So I don't believe that he's any closer to addressing that than he was the day that he went into jail. He hasn't provided any support. You know, there's been very limited contact, et cetera.

N.T., 6/4/24, at 94-96.

The trial court based its findings of grounds for termination under subsections 2511(a)(1) and (2) on Father's DUI and EWOC convictions, which led the court to conclude that Father had an "out of control" and "unaddressed substance abuse disorder." *Id.* at 93 (trial court finding Father's convictions to be "a significant indicator" that Father's "substance use is out of control"); *id.* at 95 (trial court finding Father's "use of controlled substance or alcohol … is out of control," and concluding Father had done "apparently nothing" to remedy his "substance abuse disorder").[5]

---

[5] The termination statute addresses instances when a child is the victim of a parent's crime, and provides grounds for termination when a parent has been convicted of homicide or aggravated assault of a child, or attempt, solicitation or conspiracy to commit homicide or aggravated assault of a child. 23 Pa.C.S. § 2511(a)(9). The statute also provides grounds for termination when a parent "has been found … to have committed sexual abuse against the child

*(Footnote Continued Next Page)*

The record does not support the trial court's findings. CYF presented no evidence that Father had a substance abuse issue, or that Father was required or ordered to be evaluated or obtain treatment for substance abuse. Father was incarcerated from the time CYF obtained custody of the Children in February 2023, to when the trial court entered the termination decrees in June 2024. Ostensibly, Father did not use drugs or alcohol and was sober during the 16 months preceding the hearing.

The record also reflects that the circumstances of Father's incarceration, particularly at Dauphin County Prison, impeded Father's ability to participate in the dependency process and perform parental duties, albeit from prison. The evidence, including evidence presented by CYF, indicates that Father encountered obstacles which restricted his ability, in the words of the trial court, "to move the ball forward." *Id.* at 94; *see also* TCO at 5 (trial court referencing "Father's communication problems" at Dauphin County Prison).

*Father's Family Service Plans*

At the beginning of the termination hearing, counsel for CYF stated that the "only exhibits as it relates to Father[,] are going to be the family service plans." N.T., 6/4/24, at 10. Counsel continued:

> More specifically, as it relates to Father …, we would move for the admission of [CYF] Exhibit Number 1, which is the initial family

---

or another child of the parent." *Id.* at § 2511(a)(10). The statute is silent as to a parent's convictions of other crimes involving their child, including DUI and EWOC.

service plan dated March 9, 2023. We would move for the admission of [CYF] Exhibit Number 2, which is the updated family service plan dated August 22, 2023. Finally, we would move for the admission of [CYF] Exhibit Number 3, which is the revised family service plan dated January 16, 2024. And again, those are exhibits only as it relates to Father.

*Id.* at 10-11.

The trial court admitted the family service plans (FSPs) without objection. *Id.* at 11. Exhibit 1, the March 9, 2023 FSP, states that Father's objectives were: (1) notify the caseworker of any change of address or phone number; (2) "complete any classes on parenting or related topics while incarcerated"; (3) "sign any releases of information necessary" for CYF; and (4) notify CYF "of anyone who could be a resource for" Children. Exhibit 1 at 11, 13.

Exhibit 2, the August 22, 2023 FSP, repeats the same objectives: (1) notify caseworker of any change of address or phone number; (2) "complete any classes on parenting or related topics while incarcerated"; (3) "sign any releases of information necessary" for CYF; and (4) notify CYF "of anyone who could be a resource for" Children. Exhibit 2 at 12, 14. Exhibit 2 also contains comments from the caseworker, Ms. Grab, stating:

Caseworker has attempted to contact a representative from Dauphin County Jail to be able to maintain fluent communication for court hearings, etc., but has been unsuccessful.

Caseworker asked [Father] if he has a counselor or other person in the jail that he regularly communicates with, and he said no.

[U]pdate 8/22/23-at the expedited hearing on 8/21, it was known that [Father] is now in state prison—Smithfield Correctional Institution. …

*Id.* at 19.[6]

Exhibit 3, the January 16, 2024 FSP, states that "Father remains incarcerated with an estimated date in August 2024 for release." Exhibit 3 at 2. Father's objectives were unchanged: (1) notify caseworker of any change of address or phone number; (2) "complete any classes on parenting or related topics while incarcerated"; (3) "sign any releases of information necessary" for CYF; and (4) notify CYF "of anyone who could be a resource for" Children. *Id.* at 12, 14. In the comments, Ms. Grab stated:

> Update 1/16/24: [Father] is now at SCI Rockview. Caseworker will reach out to SCI to ask for a counselor or contact person to assure that [Father] receives the invitations to court proceedings and see if he has applied for an attorney for court representation. An application for court appointed counsel was sent to [Father] and his mother but they have not confirmed if the application was filled out and caseworker has not received a notification from the court to state that a counsel was appointed.

*Id.* at 19.

In sum, Father's FSPs do not mention or contemplate substance abuse; the FSPs also corroborate Father's claim that he was unable "to meaningfully

---

[6] Mother was responsible for the update. Neither Father nor any counsel for Father appeared at the hearing. CYF's counsel questioned Ms. Grab about efforts to "obtain [F]ather's presence at this proceeding," and Ms. Grab replied, "in Dauphin [C]ounty there have been some transportation issues." N.T., 8/21/23, at 27. While CYF's counsel continued to question Ms. Grab, asking what Father "reported … while he's been at Dauphin County Prison?", Mother's counsel interjected: "Your Honor, and [counsel,] [M]other indicated to me [that Father is no longer at Dauphin County Prison,] so while we were sitting here I did pull up VINELink, he's actually currently at SCI Smithfield. He's no longer in Dauphin [C]ounty." *Id.* at 29-30.

participate in judicial proceedings," and anticipated being released from prison within three months of the termination hearing, on August 21, 2024.

*Caseworker Michelle Royer*

Next, CYF presented testimony from Michelle Royer, who testified to being a "contracted caseworker" for CYF, and "assigned … to the family" three months prior, on March 5, 2024. N.T., 6/4/21, at 13-14. She testified that she visited children "monthly" in foster placement. *Id.* at 29. Ms. Royer also testified that Father's FSPs were "forwarded" to Father in prison, although she never confirmed he received them. *Id.* at 17, 34.

Ms. Royer explained that Father was unable to visit Children "due to being in prison," and noted Father's "maximum date" of incarceration of August 21, 2024. *Id.* at 19-20. She stated that CYF did not offer Father any services because "[h]e is incarcerated." *Id.* at 21, 38. Ms. Royer opined that Father's incarceration "has caused [Children] to be without essential parental care, control and subsistence." *Id.* at 24.[7] Ms. Royer stated, "as far as [she] kn[e]w," Children had never resided with Father. *Id.* at 30-31. When CYF's counsel asked Ms. Royer if she knew whether "Father was involved" with raising the Children, Ms. Royer replied, "I don't have anything." *Id.* at 31. She also testified that the Children did not have a pre-adoptive resource. *Id.*

On cross-examination by Father's counsel, Ms. Royer reiterated that she did not confirm Father's receipt of the FSPs. *Id.* at 34. She said, "I have

---

[7] At this point in the testimony, Mother interjected, "So why doesn't he have a chance?" *Id.* at 25.

never talked to the Father." *Id.* Ms. Royer noted that Father had "reached out" to CYF on August 21, 2023, but CYF did not respond. *Id.* at 40. She also reiterated that Children did not have an adoptive resource. *Id.* at 39.

*Mother*

Father's counsel also questioned Mother, who appeared by Zoom. *Id.* at 5. Father's counsel asked Mother:

Q. Prior to [Father's] incarceration, did he reside with you and [C]hildren?

A. Yes.

Q. Was he a daily presence in their lives?

A. Yes. He watched them while I went to work.

Q. And did he also work?

A. Yes.

Q. So that one of you work[ed] dayshift and the other a nightshift[?]

A. Yes.

Q. [S]o there was always someone[?]

A. Yes, I worked dayshift in a nursing home and he worked second shift cooking in a kitchen.

Q. After his incarceration, did you at any time facilitate phone or video visits between Father and [C]hildren?

A. Yes, I did every day.

Q. And for how long did that go on?

A. Until they were taken.

*Id.* at 62-63.

CYF's counsel asked Mother a single question:

Q. When you resided with Father, were both of you actively engaged in your addiction issues?

A. No. I had four years in recovery and [Father] was also sober.

*Id.* at 63-64.

*Father*

Father was transported from SCI Rockview to appear in person. *Id.* at 15. Father's counsel first asked:

Q. [Father], prior to your incarceration, did you live with [C]hildren?

A. Correct.

Q. You did live with them from birth?

A. Yes.

Q. And were you daily present in their lives prior to your incarceration?

A. Absolutely.

Q. I'm going to ask you to speak up into the microphone?

A. Absolutely.

Q. Is it accurate that your absolute release date is August 21st, 2024?

A. Sure.

Q. And that's just a matter of doing the math from your sentence, correct?

A. Correct.

*Id.* at 66.

When Father's counsel showed him CYF Exhibit 1, the initial FSP dated March 9, 2023, Father stated that he had seen it when he was incarcerated at

Camp Hill.  *Id.* at 67.  Father testified that he did not receive or see the other FSPs.  He stated:

> I've gotten mail saying that my stuff was confiscated and returned to sender because there was no control number or something like that[,] along those matters for legal mail.  You have to have a control number and they weren't sending mail with a control number on it, so it was being confiscated and [it was] returned to sender.

*Id.*

> Regarding contact with CYF, Father testified:

> The only person that I've ever talked to was Isabella Grab and I initiated that.  The whole time this has been going on … other than Ms. Grab[,] and me initiating that communication and contact, I feel like I've been shut out.

*Id.*; *see also id.* at 77 (Father stating, in response to questioning by the trial court, that he "was never told anything," and, "[t]hat's what I'm saying, I've been shut out.  I never have gotten anything other than -- I got one [FSP]").

Father explained he was able to call Ms. Grab because his mother "would three-way me through [her phone to] the prison phone."  *Id.* at 74.  Referring to caseworkers, Father stated that CYF "keep[s] switching them up."  *Id.* at 76.

Father testified that he was moved from Dauphin County Prison in August 2023.  His counsel asked:

> Q. And while [incarcerated], did you attempt to participate in any education or counseling programs?
>
> A. SCI or Dauphin County[?]
>
> Q. First in Dauphin County.

- 24 -

A. Dauphin County did not have any of those resources. And I-- however you would go about it, that could be verified ….

Q. What about when you were at the SCI?

A. They said that because I was so far over my minimum and close to release that the programs that they wanted me to do were a year long and I didn't have enough time to complete those programs.

Q. Did you ever reach out to someone at the facility to try to arrange for these services? Let me rephrase. Did you ask to participate in those services?

A. For what services?

Q. While at the SCI you mentioned some classes that weren't available to you.

A. Yes.

Q. But you did attempt to participate … in those, correct?

A. Correct.

Q. Have you made any attempts to have contact with [C]hildren since your incarceration?

A. Yes. Like I said, I was calling them on a regular basis every day, talking to them through [Mother]. And even when they were … with [CYF], I was seeing them through a video trying to figure out a way to [navigate the dependency process]. Because, like I said, I was shut out. I wasn't being taken to court dates. Nobody was trying to help me be in contact with [C]hildren, and [Mother] at the time was the only way to make that happen. And she said that [CYF] told her that I needed to worry about myself and she needs to worry and focus on herself, and that it's in [my] best interest … to no longer have video visits while she was having her visitation time with the kids.

Q. Now, when you are released in just over two months, do you have a plan for employment?

A. Yes, sir.

Q. Can you describe that? …

A. I have a job. I work through three different temp agencies which I'm registered with. It's very easy, there is always work. You go in and they've got a list of stuff. You pick which one you want, pick which shift you want and they provide transportation. There are numerous jobs, but I would probably be looking to go back to Allen Distributions. …

Q. Could you repeat the last part and be clear in the microphone where you would go back to?

A. Allen Distributions.

Q. And do you have a plan for housing?

A. Yes, I have a plan for housing. I have a resource available t[o] me through my mom's ex-husband, his name is John Wilson. He works with … nonprofit organizations and financial assistance. And he told me that as long as I … provide him with a letterhead from Allen Distributions, which is already set up, stating this will be my hourly rate[,] and this is what I'll be able to make[,] and this is what my monthly income will be, he's willing to put me in a place before I even get the money.

*Id.* at 68-71.

CYF's counsel and the trial court both questioned Father:

[CYF's Counsel]: And while you were incarcerated at either the state correctional institution or at Dauphin County, were there any occasions when you were required to be segregated?

[Father's counsel]: I object to the relevance.

THE COURT: Answer the question.

THE WITNESS: Was I required to be segregated?

THE COURT: Kept out of general population. Did you ever get yanked out of general population, when and why?

THE WITNESS: I got yanked out of population and found not guilty of a misconduct. The misconduct was disruptive behavior and found not guilty.

THE COURT: And where was that[?]

THE WITNESS: That was Dauphin County.

THE COURT: You said earlier you were in the hole. I think [CYF's counsel] was trying to ask about that. You were in the hole in state prison, what [wa]s that for?

THE WITNESS: That's been most recently, since March 7th[,] I've [been] in the hole.

THE COURT: Why?

THE WITNESS: I think that I told you that in my letter, that is their form of protective custody.[8] It's a level 5 maximum security prison – I mean, housing unit, and that was my way of choosing to avoid a situation and stay out of trouble. I was refusing to go to population because I didn't want to put myself in a predicament to have to do something to somebody, if they did something to me and vice versa, and looking at a longer stay or possible street charges or whatever would have to come out. …

BY [CYF's counsel]:

Q. So you requested to be placed in that situation, correct?

A. Correct. …

Q. At the time that you were arrested, were you in active addiction?

A. No.

---

[8] The record contains a letter from Father postmarked May 8, 2024 from SCI Rockview, which Father addressed to the York County Clerk of Orphans' Court with a note asking the Clerk to "please make sure [the trial court] receives the enclosed letter," and requesting "a copy of the enclosed letter time stamped and dated so I know your office received my letter." Correspondence, 5/13/24. In the postscript, Father stated:

P.S. I have not been in the hole for being a knucklehead. I am in the hole for refusing to go to general population, because I don't feel safe. Rockview does not have a protective custody housing unit. The hole is their protective custody because it is a maximum security unit. I just wanted to inform you so you don't think I am being a troublemaker and haven't changed.

*Id.* at 3.

*Id.* at 72-74.

The trial court continued to question Father:

Q. What drugs were you on at the time you were driving with your kids in the car?

A. I wasn't on any drugs, Your Honor. If alcohol—

Q. Alcohol, all right. How much alcohol was in your system at that time?

A. The legal limit.

Q. The legal limit?

A. Yes.

Q. So the legal limit would be under .08?

A. Correct.

Q. So you were under .08?

A. I would say so because I didn't have a lot -- I only had a beer. I didn't have a lot to drink.

Q. Did you plead guilty to a DUI?

A. No.

Q. Well, what were you sentenced for? I'm confused here because there was an endangering welfare charge. Why are you in jail?

A. I was found guilty at a jury trial.

Q. Of what?

A. DUI and endangering the welfare of children. But it's general impairment, so they don't need a blood draw.

Q. Did you give blood?

A. No.

Q. Okay. So the jury convicted you of DUI, correct?

A. Correct.

Q. So that's a fact that I can't overturn or disturb. But it's your contention today that you didn't have enough to be over the legal limit?

A. Absolutely not.

Q. Okay. What was your sentence?

A. My sentence was 18 to 36 months, Your Honor.

Q. Okay. And when did you leave Dauphin County Prison to go to Camp Hill?

A. August 9th, I believe it was, of 2023.

Q. All right, where did you go from there? You went to Camp Hill and then from Camp Hill where did you go next?

A. To … SCI Smithfield.

Q. And that's in Huntingdon, right?

A. I believe so, right up the street from it.

Q. So Camp Hill to Smithfield. And then where did you go?

A. Back to Camp Hill.

Q. And then where did you go?

A. SCI Rockview.

Q. And where you are right now?

A. SCI Rockview.

Q. And didn't somebody say you were in Benner Township?

A. They said Bellefonte, PA, and then the paperwork [was] sent to Albion and I was never at Albion.

Q. That is why I was confused. It seems like you must have moved around a lot if you were in Smithfield, Camp Hill, Rockview, Benner Township and Albion, those were different facilities.

A. No, Your Honor. I went to Camp Hill … to Smithfield to Camp Hill and then sent to my home jail, SCI Rockview, where I've been ever since.

***

- 29 -

Q. Are there any conditions of your sentence regarding contact with [C]hildren?

A. No, sir. And I can get you that documentation.

Q. Well, it's do or die today because I have to make a decision today. I mean, it is what it is.

*Id.* at 79-81, 83.

Father's counsel then stated, "I would submit [Father's] Exhibit 1, which is his sentence of 533 days," and the court admitted the exhibit into evidence. *Id.* at 84-85.

Based on the above evidence, we cannot conclude that the record supports a finding of grounds for termination under subsections 2511(a)(1) and (2). There is no evidence of Father's substance abuse beyond his DUI conviction,[9] and substance abuse was not mentioned in his FSPs. The trial court stated, "It could have helped Father had he substantiated his claim that he has no concerns with a substance use disorder. He did not provide any evidence that he had a drug and alcohol evaluation that gave him a clean bill of health." TCO at 14. The trial court disregards that Father was not required to address substance abuse in his FSPs, as well as Father's limited ability to obtain evidence given his incarceration. *See id.* (trial court referencing "limitations on communications imposed by Dauphin County Prison").

Accordingly, the record does not support a finding that Father, "by conduct continuing for a period of at least six months immediately preceding

---

[9] The trial court docket at CP-22-CR-0000356-2022 indicates that the incident leading to the conviction occurred in 2022.

- 30 -

the filing of the petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). Given the circumstances of his incarceration, Father did what little he could. For example, he had his mother use three-way calling on her phone so he could speak with Ms. Grab. N.T., 6/4/24, at 74. The trial court observed that there "are many parents that are incarcerated and still manage to interact and express their love for their children." TCO at 12.[10] However, the trial court disregards the "limitations on communication imposed by Dauphin County Prison," *id.* at 5, and the impact of Father's various transfers between SCIs.

Likewise, the record does not support a finding that Father's "repeated and continued incapacity, … has caused [Children] to be without essential parental care, … and the causes of the incapacity, … **cannot or will not be remedied by the parent**." 23 Pa.C.S. § 2511(a)(2) (emphasis added).

Father accurately testified that he would be released from prison on August 21, 2024. We take judicial notice of the records of the Pennsylvania

---

[10] The trial court stated that "communications which were made by Mother … were ultimately terminated by her," and "Mother apparently stopped helping [Father] have contact." TCO at 7, 12. The record does not support these statements. Mother testified that she facilitated "phone or video visits between Father and [C]hildren … every day[, **u**]ntil they were taken." N.T., 6/4/24, at 63 (emphasis added).

Parole Board, which indicate that Father was released on August 21, 2024.[11] We also note that Children did not have an adoptive resource. *See* TCO at 6.

We have "long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020). Furthermore, "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2)[,] where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care[.]" *In re Adoption of S.P.*, 47 A.3d at 828. Pertinently, "the length of the remaining confinement can be considered as highly relevant." *Id.* at 830.

We are also cognizant that "[e]ach case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind ... that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Int. of K.M.W.*, 238 A.3d at 474. The Supreme Court has held:

> Neither subsection [2511](a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights. Nevertheless, this Court has observed that the provision or absence of reasonable efforts may be relevant to a

---

[11] "A judicially noticed fact must be one not subject to reasonable dispute in that it is...capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Pa.R.E. 201(b). Judicial notice can be taken at any time, including on appeal. Pa.R.E. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

court's consideration of both the grounds for termination and the best interests of the child. For example, as applicable to subsection (a)(2), a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity "cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2).

*In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014); *see also Interest of T.M.W.*, 232 A.3d 937, 950 (Pa. Super. 2020) (finding agency's lack of assistance was "determinative in our conclusion that the evidence was not 'so clear, direct, weighty, and convincing' to prove that ... [the] causes of [the] mother's incapacity cannot or will not be remedied by her under [S]ection 2511(a)(2)").[12]

Instantly, we conclude the record does not support termination under subsection 2511(a)(2), or subsections 2511(a)(1), (5) and (8).[13] Thus, we vacate the decrees terminating Father's parental rights and remand for further dependency proceedings.

*Children's Goal Change*

The trial court did not explain its goal change decision at the hearing. The court only stated, "I'll change the goal to adoption at this point." N.T., 6/4/24, at 101. In its opinion, the court briefly addressed the goal change, stating:

---

[12] Father stated, "there is a difference … between refusing to be involved, and being incapable. … I have NEVER lost an interest in wanting to be a loving father to [Children]." Correspondence, 5/13/24.

[13] Because CYF did not prove grounds for termination under 23 Pa.C.S. § 2511(a), we need not consider needs and welfare under 23 Pa.C.S. § 2511(b).

Regarding the change of goals, the court is expected to use its own judgment when approving a change of goals. The court[,] having little evidence of improvement made by [Father,] determined that it was appropriate to change the goal of the dependency cases from reunification to adoption. The court's actions were not beyond its authority or reasonable judgment.

TCO at 11-12.

The record indicates CYF made, at most, minimal efforts to reunify Children and Father. An agency "must redirect its efforts towards placing the child in an adoptive home only after 'the child welfare agency **has made reasonable efforts** to return a foster child to his or her biological parent, but those efforts have failed[.]'" ***Int. of T.M.W.***, 232 A.3d at 947 (emphasis in original) (citing ***In re G.P.-R.***, 851 A.2d 967 (Pa. Super. 2004)). For the reasons stated in our discussion of Father's parental rights, we also conclude the trial court erred in changing Children's permanency goals.

*CONCLUSION*

Because the record does not support the trial court's decision to terminate Father's parental rights and change Children's permanency goals, we vacate the decrees and orders, and remand the case for the trial court to resume dependency proceedings.

Decrees and orders vacated. Case remanded for further proceedings.
Jurisdiction relinquished.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/03/2024